**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MVP HEALTH PLAN, INC.,**

                                        **Plaintiff,**

**v.**                                                                    **1:13-CV-1578 (BKS/CFH)**

**OPTUMINSIGHT, INC.,**

                                        **Defendant.**
_____

**APPEARANCES:**

For Plaintiff:
**Arthur J. Siegel, Esq.**
Bond, Schoeneck & King, PLLC
22 Corporate Woods Blvd., Suite 501
Albany, NY 12211

For Defendant:
**Karl Geercken, Esq.**
**Steven L. Penaro, Esq.**
Alston & Bird LLP
90 Park Ave.
New York, NY 10016

**Hon. Brenda K. Sannes, United States District Court Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

On December 23, 2013, Plaintiff MVP Health Plan, Inc. ("MVP") brought this diversity action against Defendant OptumInsight, Inc. ("Optum"), alleging breach of a contract to provide actuarial services.  As a result of the alleged breach, MVP now seeks judgment in the amount of $12,408,641.

In the Memorandum-Decision and Order of September 30, 2016, the Court adjudicated the parties' cross-motions for summary judgment.  *MVP Health Plan, Inc. v. OptumInsight, Inc.*, No. 1:13-CV-1578 (BKS/CFH), 2016 WL 6638190 (N.D.N.Y. Sept. 30, 2016).[1]  The Court granted MVP's motion for partial summary judgment, dismissing Optum's affirmative defense that a master agreement between the parties limited damages to "the amount MVP paid or owes [Optum] for the 12 month period immediately prior to the incident giving rise to the cause of action."  *Id.* at *1 (alteration original in summary judgment Decision).  The Court denied Optum's motion for summary judgment and its alternative motion for partial summary judgment, and the litigation progressed to trial.  *Id.*

The Court held a bench trial from February 6–10, 2017.  On April 10, 2017, the parties submitted proposed findings of fact and conclusions of law.  (Dkt. Nos. 101–02).  The Court has carefully considered the trial record, the demeanor of the witnesses, all evidence in the record, and the parties' trial and post-trial arguments.  Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

## II.    FINDINGS OF FACT

### A.  The Parties

---

[1] Lexis citation unavailable.

## 1. Introduction to the Parties

MVP is a corporation that provides health care plans, including Medicare Advantage Plans ("MA Plans"). (JPTS, ¶ 1).[2] Optum, a subsidiary of United Healthcare, is an entity that provides analytics, technology, actuarial, and consulting services to businesses in the healthcare industry. (*Id.* at ¶ 2). Optum was known as a provider of specialized, professional services in this field. (TT, p. 487).[3]

By 2012, the parties had established a long-standing business relationship. Brent Greenwood—an Optum actuary—held a particularly relevant role in this relationship, having worked with MVP and its predecessor company since 1982. (*Id.* at p. 157). Since 2006, Greenwood was the certifying actuary for all of MVP's MA Plan work. (JPTS, ¶ 9). In this capacity, he was responsible for certifying to Centers for Medicare and Medicaid Services ("CMS") that the bid was prepared according to applicable laws, CMS instructions, and the Actuarial Standards of Practice. (TT, p. 37).

## 2. The Parties' Relationship

In September 2000, Optum's predecessor company Ingenix, Inc. entered into a Master Services and Licensing Agreement ("2000 MSLA") with MVP. (J-1)[4]. In December 2003, the parties revised the agreement with an updated MSLA ("2003 MSLA"). (J-2). In relevant part, that document provides:

> When Customer agrees to purchase and Ingenix agrees to provide Software, Data or Services to Customer *under this Agreement*, the parties *shall* sign appropriate product Schedules to this Agreement.
> . . .
> Except as provided in any paragraph relating to indemnification or for any intentional infringement of the intellectual property rights of Ingenix, each party's liability to the other party for direct damages arising out of this Agreement shall

---

[2] Throughout this Opinion, "JPTS" denotes citation to the parties' Joint Pretrial Statement. (Dkt. No. 74).
[3] Throughout this Opinion, "TT" denotes citation to the transcript of the bench trial.
[4] Throughout this Opinion, "J-," "P-," and "D-" denote citation to Joint, Plaintiff, or Defense exhibits, respectively.

not exceed the amount Customer has paid or owes Ingenix under this Agreement for the 12-month period immediately prior to the incident giving rise to the cause of action. . . . Under no circumstances will either party . . . be responsible under this Agreement for any indirect, incidental, special or consequential damages resulting from either party's performance or failure to perform under this Agreement.

(J-2). Both the 2003 and 2000 MSLA versions also preclude the recovery of consequential damages. (*Id.*). In March 2011, the parties amended the indemnification provision, replacing the first sentence with the following text:

Except as provided in any paragraph relating to indemnification or for any intentional infringement of the intellectual property rights of Ingenix, or for a breach of a party's confidentiality rights hereunder, or for personal injury . . . caused by the negligence or misconduct of a party or its personnel, each party's liability to the other party for direct damages arising out of this Agreement shall not exceed the amount Customer has paid or owes Ingenix under this Agreement for the 12-month period immediately prior to the incident giving rise to the cause of action.

(Dkt. No. 54-14). At summary judgment, the Court ruled that absent a signed schedule, the parties are not bound to the 2003 MSLA in their actuarial services transactions. *MVP Health Plan, Inc.*, 2016 WL 6638190, at *9.

## B. Actuarial Standards of Practice and the Code of Professional Conduct

The Actuarial Standards of Practice ("ASOPs") are a set of rules pertaining to professional actuarial work. The Introduction to the October 2008 ASOPs, which is the relevant version for when the underlying facts of this litigation occurred, notes that "actuaries are required to observe" the ASOPs and states:

The [Actuarial Standards Board ("ASB")] is vested by the U.S.-based actuarial organizations with the responsibility for promulgating ASOPs for actuaries providing professional services in the United States. **Each of these organizations requires its members, through its *Code of Professional Conduct*, to observe the ASOPs of the ASB when practicing in the United States.** Actuaries who are required by their non-U.S. actuarial organizations to observe applicable standards of practice when providing professional services should also look to these ASOPs when practicing in the United States. . . . .

The ASOPs are not narrowly prescriptive and neither dictate a single approach nor mandate a particular outcome. ASOPs are intended to provide actuaries with a framework for performing professional assignments and to offer guidance on relevant issues, recommended practices, documentation, and disclosure. **Each ASOP articulates a process of analysis, documentation, and disclosure that, in the ASB's judgment, constitutes appropriate practice within the scope and purpose of the ASOP.**

(P-4, §§ 2.1, 3.1.1, 3.1.9) (emphasis added).

### 1.   ASOP 1:  Introductory Actuarial Standard of Practice

ASOP 1 provides, in relevant part, that where other ASOPs call for "reasonable" steps, methods, inquiries, assumptions, or methods, "[t]he intent is to call upon the actuary to exercise the level of care and diligence that, in the actuary's professional judgment, is necessary to complete the assignment in an appropriate manner." (*Id.* at p. 9).

### 2.   ASOP 23: Data Quality

ASOP 23 provides, in relevant part, that "whether the actuary prepared the data or received the data from others, the actuary should review the data for reasonableness and consistency, unless, in the actuary's professional judgment, such review is not necessary or not practical." (P-2, § 3.5).  It notes that "**[i]f similar work has been previously performed for the same or recent periods, the actuary should consider reviewing the current data for consistency with the data used in the prior analysis.**" (*Id.*) (emphasis added).  The ASOP continues, "[i]f, in the actuary's professional judgment, it is not appropriate to perform a review of the data, the actuary should disclose that the actuary has not done such a review and should disclose any resulting limitation on the use of the actuarial work product." (*Id.*).  This and other disclosure requirements are contained in § 4.1 of the same ASOP.  ASOP 23 also states that "[t]he actuary should comply with the requirements of ASOP No. 41, *Actuarial Communications*, regarding the preparation and retention of the documentation." (*Id.* at § 3.8).

### 3.   ASOP 41: Actuarial Communications

ASOP 41 defines an actuarial communication as "[a] written, electronic, or oral communication issued by an actuary with respect to actuarial services." (P-1, § 2.1). The rule provides:

> The performance of a specific actuarial engagement or assignment typically requires significant and ongoing communications between the actuary and the intended users regarding the following: the scope of the requested work; the methods, procedures, assumptions, data, and other information required to complete the work; and the development of the communication of the actuarial findings.
>
> The actuary should take appropriate steps to ensure that the form and content of each actuarial communication are appropriate to the particular circumstances, taking into account the intended users. The actuary should take appropriate steps to ensure that each actuarial communication is clear and uses language appropriate to the particular circumstances, taking into account the intended users. . . .
>
> An actuarial communication should identify the party responsible for each material assumption and method. Where the communication is silent about such responsibility, the actuary who issued the communication will be assumed to have taken responsibility for that assumption or method.

(*Id.* at §§ 3.1–3.1.2, 3.1.4) (internal numeration and formatting omitted).

### 4. The Code of Professional Conduct

The actuarial Code of Professional Conduct, adopted by "the five U.S.-based actuarial organizations," "sets forth what it means for an actuary to act as a professional" and "identifies the responsibilities that actuaries have to the public, to their clients and employers, and to the actuarial profession." (P-3, p. 1). In relevant part, the Code of Professional Conduct, annotation 1.1 provides that "an actuary shall perform actuarial services with skill and care" and that "[a]n actuary shall ensure that Actuarial Services performed by or under the direction of the Actuary satisfy applicable standards of practice." (*Id.* at p. 2).

### C. The MA Bidding Process

### 1. Overview

In order to provide MA Plans, MVP is required to submit annual Medicare Advantage Bids ("MA Bids") to the Centers for Medicare and Medicaid Services ("CMS"). (*Id.* at ¶ 3). Each year, CMS reviews these submissions to ensure that the health plans are reasonable and affordable. (D-36, p. 61). The MA Bids, which MVP submits the year prior to the effective year of the MA Plans at issue, contain pricing parameters that govern premiums for MVP's health plans once CMS accepts the bids. (JPTS at ¶¶ 4–5). As part of this annual bidding process, MVP retains an outside actuary to help prepare and calculate MA Bids for the next year of coverage. (*Id.* at ¶ 6).

A critical aspect of these calculations is the determination of appropriate "cost sharing," which is the amount of money that plan members contribute as copays for particular medical services. (TT, p. 39). The cost sharing data directly impacts the MA Bids, because increased copay amounts for a given service reduce the amount of money that MVP must expend as benefits for that service. MVP therefore prices its coverage in accordance with cost sharing assumptions.

The annual MA Bids submission to CMS is contained in a standard spreadsheet called the Bid Pricing Tool ("CMSBPT"). (J-47). The CMSBPT requires health care plan providers to input cost sharing values for a list of benefit categories determined by CMS, known as Plan Benefit Package Categories ("PBP Categories"). (D-36, p. 61). The PBP Categories, which describe various types of medical services, are broader than the categories of services that MVP and Optum consider when making complex pricing calculations. (J-29).

## 2.  Pricing the MA Bids

In order to share information for the 2013 Bid Year, MVP and Optum used a Microsoft Excel workbook containing several spreadsheets: "Notes," "PBPCats," "Mapping," "WS3

Notes," "Effective Copays," and "Copays Used in MA Bid Tool."[5] (J-29). The Mapping tab, also referred to as the Data Mapping Tab ("DMT") is of particular relevance to this litigation. The DMT was an Optum tool that contained complex data and formulas used to itemize the medical services and accurately price them for each MA Plan that MVP offered. (TT, pp. 41–42, 175–76). The DMT contained more categories of services than the PBP Categories, which permitted Optum to "refine the pricing of the specific services identified." (*Id.* at p. 176). By narrowing the categories of service to these more specific areas, Optum could more accurately predict costs and income for MVP's MA Plans. (*Id.* at pp. 41–42, 175–76). Prior to CMS submission, Optum would align the DMT data with the PBP Categories in the CMSBPT, which Optum would then send to CMS. (*Id.* at p. 82). The DMT also contained a "Comments" column, which noted service categories for which MVP did not charge a copay; in other words, categories for which there was no cost sharing. (J-57).

Because of the complexity of the data and formulas contained within the DMT, MVP employees understood that they were not to interact with that tab. A.J. Tate, MVP's Director of Medicare Product Development, testified at trial that "very early on in the process, it was explained to me that there's [sic] linked cells and formulas in the tab and if I accidentally input something into this data, that it would remove that link or formula and so this was a hands-off tab to me." (TT, pp. 353–54). Tate, who is not an actuary, testified that he adhered to that direction, and that besides adding a header to indicate what year the DMT would be used for, he would not ever enter data in the tab. (*Id.* at p. 354). Since 2006 when Optum first prepared

---

[5] In the Excel program, the user interacts with a "spreadsheet" or "worksheet," which is a grid of cells organized into letters on the *x* axis and numbers on the *y* axis. The user can create one or more of these spreadsheets, which are represented by clickable tabs at the bottom left of the program window. By selecting a tab, the user can switch between spreadsheets without opening a new file. Together, the group of one or more spreadsheets is a "workbook." Typically, when the user opens an Excel file, the program displays a spreadsheet within the workbook, and if there are multiple spreadsheets, the user can select one with which to interact. For clarity, throughout this Opinion the Court refers to the parties' shared file as the "workbook" and the individual spreadsheets therein as "tabs" or "spreadsheets."

MVP's MA Bids, there is no evidence that an MVP employee ever changed or added any data to DMTs. (*Id.* at pp. 175–76, 368).

Instead, MVP would input cost sharing data into the PBPCats tab. Tate testified:

> [The PBPCats tab] is what I would call my benefit grid . . . . [It] is a format that we need to communicate all of this information to the actuaries so that they can come up with the price based on the various copays and coinsurances that we put in this grid for each product. . . . [T]his is my grid that I've always said I own, it's my communication tool with Optum to tell them here are the copays for each individual product, as well as work through the process if we have to make decisions or if there's some reason that a copay or a cost sharing hasn't changed, I would highlight it for them and then inform them I've highlighted this, here's a chance that needs to go into the pricing.

(*Id.* at p. 347–50). Greenwood also testified that the PBPCats tab was referred to as the "benefit grid" and that he "would never call the data mapping tab a grid or benefit grid or a pricing grid." (*Id.* at p. 208).

Thus—in broadest terms—the pricing procedure was as follows: first, MVP input cost sharing data into the PBPCats tab, which contained categories of medical services that matched the PBP Categories used by CMS on the CMSBPT; and second, Optum then used the DMT and other tools to apply that information to more specific categories of medical services and calculate pricing parameters for MVPs' MA Plans.

### 3. MVP's No-Stacking Policy

Optum was aware that MVP made the same pricing decision each year: that it would not charge multiple copays to a member for one health provider visit, a practice known as "stacking." (TT, pp. 351, 489–90). This "no stacking" policy is critical because MVP's cost sharing rules impact its pricing for MA Plans.

### D. The 2013 MA Bids Process

### 1. MVP Engages Optum

On February 7, 2012, Li Li, Associate Director for Actuarial Consulting at Optum and the lead actuary for the 2013 MVP MA Bids, sent a letter to Lucinda Lewis, who was Vice President of Actuarial, Government Programs at MVP. (*Id.* at p. 57; J-18, pp. 1–2). The letter stated:

> OptumInsight (OI) is pleased to be assisting MVP . . . with 2013 bid preparation. To address adequately the Health Care Reform related changes being implemented for the 2013 bids, we would like to allow a little additional time this year for the preparation of your bids.
>
> We expect the 2013 bid season will be challenging . . . . Therefore, it is more important than ever that we work together to develop mutually acceptable timeframes for providing data and delivering the work product. To support that endeavor, we have enclosed several items to kick off the project:
> 1. General Calendar and OI Deliverables
> 2. Checklist of Client Deliverables
> 3. Preliminary MA Data Request, Attachments and Templates
> 4. Preliminary PD Data Request, Attachments and Templates
>
> This timeline does not include any additional projects such as financial feasibility, formulary assistance, budget preparation or PBP assistance. If you would like OI's assistance in those areas, please let us know.
>
> We want to stress that obtaining this requested information in a timely manner is essential for us to provide MVP with adequate time for review later in the process. We want to thank you in advance for your assistance with this request.
>
> Please call Brent Greenwood . . . or me . . . if you have any questions.

(J-18, pp. 1–2). Attached to the letter were requests for bid data and a form for MVP to affirm that it had provided the necessary information. (*Id.* at pp. 3–17). MVP signed a representation to Optum that it had sent all of the necessary information and that MVP understood that "Optum has relied on these items to perform its analysis and has not audited the accuracy or completeness of these items beyond an assessment of the general reasonability of the data." (J-92).[6]

Though the parties communicated about a draft schedule of services, they never executed such a schedule. (J-4). The Court ruled at summary judgment that work on the 2013 MA Bids was not pursuant to a schedule or the 2003 MSLA. *MVP*, 2016 WL 6638190, at *9–12.

---

[6] For reasons stated below, this representation does not exculpate Optum because they did not properly manage the data that MVP provided and miscalculated important information as a result.

Throughout the 2013 bid year, there was no discussion between the parties of a loss share arrangement under which Optum would "share in profits or losses associated with the performance . . . [of] the bids." (TT, p. 315).

For the 2013 bids, Brent Greenwood's billing rate was $535 per hour and Li Li's rate was $395 per hour or thereabouts. (*Id.* at pp. 217–18). Ultimately, MVP paid Optum $332,981.44 for the actuarial services pertaining to the 2013 MA bids. (JPTS, ¶ 15). Greenwood testified that, at those fees, MVP was entitled to expect actuarial work of the highest quality and also that Optum specializes in creating CMS bids. (TT, p. 218).

## 2. Changes to the 2013 DMT and Related Communication

Each year, when Optum began its work on MA Bids for MVP, it started with the work and data from the previous year and then made changes as necessary. (*Id.* at pp. 46, 168–70, 361). For example, if MVP were changing an underlying assumption about collecting copays (cost sharing), it would alert Optum to that change and Optum would then make the change in the updated DMT. When adding changes from a previous year's data in a workbook, Optum and MVP would highlight changes to alert each other to the addition. (*Id.* at pp. 48, 55–56, 176–78, 360). Li, who—as noted above—was the lead actuary on the 2013 bids, testified that she would want to inform MVP in writing of any significant changes. (*Id.* at pp. 55–56). She also testified that cost sharing values are "one of the key assumption[s]" in preparing an accurate bid. (*Id.* at p. 39).

For the 2013 bid year, Li broke from the typical practice by creating a new DMT that did not adopt the cost sharing information from the previous year's DMT; however, she failed to inform MVP in writing that she had made this change. (*Id.* at pp. 61–63). Among other differences, this new DMT did not include data from the old "Comments" column that denoted

the "no-copay" service categories. (*Id.*). Thus, the new DMT did not accurately depict the "no stacking" policy and misrepresented other cost sharing assumptions.

When putting together the new DMT, Li was in communication with A.J. Tate, the Director of Medicare Marketing Communications & Product Development at MVP. (J-22). On March 29, 2012, Tate emailed Li, asking her to send "the grid with the correct format" so that he could update the data that Optum needed. (*Id.*). That same day, Li replied with an attached workbook labeled "MVP 2013 Cost Sharing template – Sent.xlsx." (J-23). In the email, she stated, "In the 'Notes' tab, I explained the contents. After you review the mapping, please provide us with your feedback so that we can make necessary changes." (*Id.*). The workbook contained three spreadsheets, one labeled "Notes," another "data mapping," and the third "PBPCats." (J-24). The Court credits Tate's testimony that he did not review the data mapping tab or Notes tab, but that he reviewed the PBPCats tab. (TT, pp. 378–79). On April 27, 2012, Tate responded to Li, stating in relevant part:

> I realized the grid you sent me has our 2011 copays and cost-sharing in it. I need to be sure I'm working on the correct grid with the correct PBP categories for 2013. Can you please verify that for me and send me the grid that you need for 2013 bids?

(J-25). Li responded that she had sent the correct grid. (*Id.*).

On May 2, 2012, Li emailed Tate another workbook, this one labelled "MVP 2013 Cost Sharing template – Sent 20120502.xlsx." (J-26). Her email indicated that the workbook was "the benefit grid updated to 2013 plan ids [sic]." (*Id.*). The next day, Tate sent Optum his draft workbook. (J-28, 29). The workbook contained the 2012 version of the DMT and his updated PBPCats tab, both of which had the correct cost sharing information. (J-29). Soon after receiving the email, Li reviewed that version of the DMT and realized it was from the 2012 MA bid. (TT, pp. 90–91). When Li responded to Tate's email later that day, however, she did not

mention that she was using a new version of the DMT. (J-30). Despite Tate's updates in the

PBPCats tab and the cost sharing information contained in the Tate-DMT, Li did not update her

newly created DMT to reflect the correct cost sharing. (TT, p. 98). She sent Tate an updated

workbook that replaced his DMT with her new one and stated that "[i]t would save [Optum] a lot

of time if [Tate would] use the attached file to update any benefits." (J-30).

Li sent Tate updated workbooks between May 7, 2012 and May 31, 2012; however, she

did not request that Tate provide information regarding the DMT. (TT, pp. 330–31, 390–94).

Critically, none of the messages alerted Tate that the DMT version he sent had been altered. (J-

94A, J-94B, J-95A, J-95B, J-96A, J-96B). Li testified that she orally communicated the changes

to Tate during a weekly call (TT, pp. 72–73); however, notes from the calls do not show this

communication. (*Id.* at pp. 443–44). Both MVP and Optum participants testified that they do

not recall this subject being raised on the calls, and Greenwood testified that he was unaware of

any oral or written communication from Optum to MVP on the matter. (*Id.* at pp. 79–80, 212,

396–97). After considering all of the evidence, the Court finds that Li did not communicate the

DMT changes to MVP.

The record also shows that Optum's peer review mechanism was insufficient to catch the

mistake. Li testified to her definition of peer review:

> Peer review is to check your coworkers' work, and at Optum, we did peer review
> at two level [sic], one is at more high level, at content level to make sure the
> approach and methodology is appropriate. The other level is technical level, so
> basically make sure, you know, most of the work is done in Excel, so make sure
> the formulas and the numbers referenced in Excel are correct.

(*Id.* at p. 34). She also reaffirmed her prior deposition testimony that part of the peer review

process was to make sure that data transferred from one template to a new template is consistent

and accurate. (*Id.* at p. 36). However, as Optum's expert witness testified, "not all of the

[Optum] team members had the same shared knowledge of how the client operated" regarding

cost sharing. (*Id.* at p. 693). He also testified that Li needed accurate cost sharing information "in order to accurately reflect how MVP intended to adjudicate" claims. (*Id.* at p. 694).

### 3. Determination, Submission and Certification of the 2013 MA Bids

Prior to CMS submission and certification for the 2013 bid year, MVP used Optum's calculations to make the "final say" on premiums. (*Id.* at p. 497). On or about June 6, 2012, Greenwood filed the 2013 MA Bid with CMS. (J-36). Greenwood certified that the bid conformed with applicable ASOP standards and that the data relied upon for the bids was reviewed for reasonableness and consistency. (*Id.*). However, when asked at trial whether it was his testimony "that the creation and reliance on the data in Ms. Li's new [DMT] was not adequately reviewed for consistency with the prior year or reasonableness," he replied, "A . . . simple answer would be yes." (TT, p. 217).

### 4. Discovery of Unexpected Outcomes

After CMS had accepted the 2013 MA bids and MVP had begun to provide benefits to its members for the 2013 plan year, MVP began analyzing its projections for the 2013 MA plans. (*Id.* at p. 445–46). Greg Backus, a Senior Actuary at MVP, reviewed "what the benefit factors were by plan that were being assumed for the upcoming year." (*Id.* at p. 446). The benefit factor is a measure of MVP's expected liability versus the total allowed costs for the plan[7] (*id.*); therefore, it changes based on the relevant plan's cost sharing assumptions. In his analysis, Backus discovered that "there was a significant decrease in the benefit factors . . . a very significant difference." (*Id.*). Backus also noted that projected "per member per month costs" had significantly increased. (*Id.* at p. 446–47). Consequently, in late January 2013, Backus sent emails to Brent Greenwood and Di Lu, another Optum actuary, to inquire about the changes. (J-

---

[7] Described in other terms, the benefit factor represents "the portion of the total allowable claim cost that is absorbed by the plan as opposed to the cost-sharing portion that's paid by the member." (Dkt. No. 54-6, p. 117).

37).  At this point, there was insufficient claims data to see the actual financial impact.  (TT, p. 448).

In or about April 2013, MVP had sufficient claims experience data for Backus to note "actuals [that] were lower than what was priced for."  (*Id.* at p. 450).  Again, he contacted Optum and asked them to "help [him] understand how this was priced for, to help to try to get to the bottom of . . . the significant occurrence."  (*Id.*).  Optum directed him to the benefit grids, and after comparing the 2013 grids with the 2011 and 2012 grids, Backus discovered that "there was some significant differences in terms of the ultimate cost sharing that was assumed."  (*Id.* at pp. 450–51).  He noted that the 2013 DMT lacked comments about cost sharing that had been present in the 2011 and 2012 DMTs.  (*Id.* at p. 451).  In his testimony, Backus explained further:

> The claims data showed that our benefit factors were not dropping as had been priced for 2013.
> So . . . benefit factors made up of MVP's plan liability compared against the allowed costs, so for every dollar that's spent, how much will MVP pay out of pocket.  And so if it was priced that MVP would spend 90 cents out of their pocket on the dollar but instead we were seeing, we were spending 93 cents on the dollar out of our pocket, the dollars can definitely add up there, across millions of dollars.  So yeah, we were seeing more dollars being spent on the dollar versus what had been priced for.

(*Id.* at p. 449).

Alerted to the fact that MVP was unexpectedly losing revenue, Greenwood conducted an analysis of the situation.  (*Id.* at p. 221).  On June 26, 2013, he sent MVP an eleven page letter with exhibits, in which he offered an explanation for MVP's revenue experience.  (J-44).  Therein, he identified several events that he believed were impacting revenue: (1) the bankruptcy of Kodak, a significant MVP member group, which led to retirees moving to different plans; (2) Optum's use of cost sharing assumptions that were "consistent with the general PBP categories, but not always consistent with the detailed manner in which MVP configures benefits," which impacted plan benefit factors; (3) sequestration; (4) a change in CMS practices that improved

MVP's risk score and favorably impacted revenue; and (5) a higher than expected benefit factor even after mapping adjustments, possibly due to systems adjudication changes. (J-44, pp. 1–2). The letter notes that "[a]lthough [Optum] made correct assumptions on some services, we didn't catch all the zero copay services" and that "there were unique provisions within MVP's benefit configuration that did not align with our logic." (*Id.* at p. 5). Greenwood estimated that the loss to MVP as a result of cost sharing errors was $10.6 million, "based on the assumption premium would not change from current 2013 levels." (*Id.* at p. 2).

### 5. Potential Mitigation of Losses and Total Benefit Cost

Patrick Glavey is an MVP executive with 25 years of experience at MVP and its predecessor company. (TT, p. 483). In 2012, he was Vice President for Medicare, and in that capacity, he had oversight of the MA bid process—in particular, he "would look at things like the trend assumptions we're using, the margin assumptions . . . the high level." (*Id.* at pp. 485–86). At trial, he testified at length regarding the potential for MVP to mitigate its revenue losses.

Glavey testified that had MVP identified the problem before submission of the 2013 bids to CMS, they might have been able to mitigate losses by "rebalancing margin requirements," pricing certain plans differently, "[l]ooking at administrative cost, trying to renegotiate provider contracts," and increasing premiums. (*Id.* at p. 492). When asked whether those "types of measures" were available after the contract year began, he replied:

> Most of them go away, so you can't change the benefits, you can't change the premium, depending on how close it is to the new year you probably don't have enough lead time to change provider contracts, so really you look at, left at looking at, you know, optimizing your revenue which is something we do on a regular basis, potentially your administrative costs.

(*Id.* at pp. 492–93).  He then testified that, after the 2013 contract year had started, MVP could

not do anything to mitigate losses that it did not already do on a regular basis.[8]  (*Id.* at p. 493).  In

light of Glavey's knowledge, experience, and demeanor, the Court credits this testimony.

An important limitation on MVP's pricing strategy is the total beneficiary cost[9] ("TBC").

The TBC is "the sum of member premium and member cost sharing," and the TBC test refers to

CMS' limitation on MA plans "in terms of the change in [TBC] from one year to the other."  (*Id.*

at 117).  Glavey, along with the President and CFO at MVP, have the "final say on premiums"

and oversee pricing of MVP's MA Plans.  (*Id.* at pp. 497–98).  For this reason and those noted

above, the Court credits Glavey's testimony that MVP—had it known of the erroneous cost

sharing assumptions before bids submission to CMS—would have been able to raise premiums

sufficiently to offer the same services and same no copays that it had intended to do, all without

violating the ceiling of the TBC test.  (*Id.* at pp. 496–97, 502).

### E.  Calculating Lost Revenue

MVP offered the expert testimony of Barbara Niehus, a Fellow of the American

Academy of Actuaries with extensive experience in the pricing of health insurance products.  (*Id.*

at pp. 504–05).  Niehus analyzed the 2013 bid year to determine what the outcome would have

been if the no copay service categories had been applied to the pricing analysis—to determine

"how much more premium, or how much more revenue MVP would have tried to go after during

---

[8] For example, Greenwood testified that MVP might increase revenue by "try[ing] to improve [its] risk scores," that is, by finding and reporting riskier members in its MA Plans, which leads to "more reimbursement from CMS to cover that higher risk."  (TT, p. 278).  In response, Glavey testified that MVP already maximizes risk scores as a "regular ongoing activity."  (*Id.* at 493).  The Court credits the latter testimony because Glavey was in a better position to know MVP's mitigation options and provided a practical response to Greenwood's more theoretical proposition.

[9] Witnesses testified differently regarding the acronym "TBC" sometimes defining it as the "total benefit cost" and other times as the "total beneficiary cost."  The Court will adopt the phrase "total beneficiary cost" in light of recent CMS publications.  *See, e.g.*, Centers for Medicare & Medicaid Services, *Announcement of Calendar Year (CY) 2018 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter and Request for Information*, 113, Apr. 3, 2017, *available at* https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2018.pdf.

that 2013 bid process, had they had the correct information." (*Id.* at p. 571). Her methodology generally matched the one Greenwood employed in his analysis, though it differed in three ways: (1) use of different error categories based on her independent analysis; (2) use of actual—rather than anticipated—enrollment data; and (3) disregard for errors in claims adjudication in order to isolate the impact of the misapplied cost sharing assumptions. (*Id.* at pp. 571–72).

On cross-examination, Niehus provided a detailed explanation of her methodology for calculating what she believed should have been the projected benefit factor for the 2013 bids:

> I used Optum's data. The way that the spreadsheets were set up, the [DMT] where we have the problems with the no cost sharing, the [DMT] fed into some other spreadsheets that did the calculations, that ultimately determined this benefit factor. So what I did was to take the error categories, correct them so that they reflected the 2012 values instead of the 2013 values that were in the bids that were submitted, ran it through the spreadsheets which basically applied all the same assumptions, all the same methods, all the same calculations that were used for preparing the BPTs that were submitted, and came up with this different answer, which is the only variation there was to correct the error categories.

(*Id.* at p. 618). She then compared the outcomes that would have occurred using the Optum-calculated benefit factor and her own benefit factor—the difference between the two constitutes her measure of damages. (*Id.* at pp. 619–20). To reach this conclusion, she equated decreased revenue and increased costs, though she notes that she "was trying to measure [] the decreased revenue." (*Id.* at p. 622). This equation rests on the proposition that increased costs could have been covered by MVP. Niehus testified that if the erroneous cost sharing assumptions had "been identified prior to the bids, then other steps could have been taken" to cover those losses. (*Id.* at p. 623). When asked if she considered other causes of MVP's decreased revenue, she testified that she did but that these factors were not related to her calculation.[10]

---

[10] Niehus admitted that she did not test whether her calculations were correct in light of the TBC requirements and that she did not perform any market sensitivity analysis to see how increased premium could affect member enrollment. (TT, pp. 632–33). Alone, that would undermine the credibility of her findings because it would call into question whether MVP could have adjusted its plans to prevent the losses even with adequate foreknowledge of

Ultimately, Niehus concluded that the damages as a result of Optum's cost sharing error were in the amount of $12,408,641. (*Id.* at p. 608). Optum's expert, Adam Reese, disagreed. Reese, a Fellow of the American Academy of Actuaries, testified that he "would question whether [Niehus' analysis and opinion] really was a calculation of damages." (*Id.* at p. 649). He testified that her calculations "didn't take into account [] all of the factors . . . that occurred during 2013." (*Id.* at pp. 649–50). He also testified, "The financial performance of a health plan can be influenced by operational, market, contractual, regulatory, and environmental factors. These factors are interrelated and can each impact the plan's actual performance. Ms. Niehus' estimate of damages wholly ignore these factors." (*Id.* at p. 676). Yet, the underlying logic of the Niehus analysis was that it isolated the cost sharing assumptions from these other factors. Her failure to consider other factors is therefore not a failure at all, but rather a critical aspect of her methodology. Reese's testimony and report fail to meaningfully critique this methodology.

In its proposed findings of fact and conclusions of law, Optum submits that "[t]he only damages analysis in the record that is focused around premiums is Exhibit 3 to Mr. Greenwood's June 26, 2013 letter to MVP." (Dkt. No. 102, ¶ 112). The Court disagrees. The Niehus analysis focuses on premiums and lost revenue therefrom. Additionally, Greenwood's testimony does not mention Exhibit 3 as an alternative measure of damages. Finally, the letter was designed to provide "initial insights" and, when writing, Greenwood lacked complete information about the first quarter of 2013, let alone the year as a whole. (J-44, p. 11). Conversely, Niehus designed her analysis specifically to determine damages and had the benefit of complete 2013 data.

---

the erroneous cost sharing. However, the Court has credited the testimony of Patrick Glavey that MVP could have adjusted its pricing without running afoul these limitations. Additionally, Niehus testified that "a number of actions [] could be taken to, when the TBC would kick in, that would be able to address that problem before the bids had been submitted" and that the profit margins test would not be affected. (*Id.* at p. 639). For these reasons, Niehus' failure to consider these factors in her calculations is not fatal.

Based upon a review of all the testimony and exhibits, this Court accepts and adopts Niehus' methodology and calculations pertaining to lost revenue. The Court finds that as a result of Optum's use of incorrect cost sharing assumptions, MVP lost $12,408,641 in revenue.

## III. CONCLUSIONS OF LAW

### A. Introduction

The Court concludes that, as the parties have agreed, New York law governs this contract dispute. (Dkt. No. 101, p. 77; Dkt. No. 102, p. 23). Plaintiff must establish by a preponderance of the evidence: "(1) the existence of an agreement, (2) its own adequate performance, (3) breach by defendant, and (4) damages." *Brooklyn 13th St. Holding Corp. v. Nextel of N.Y., Inc.*, 495 F. App'x 112, 114 (2d Cir. 2012). "Causation is an essential element of damages in a breach of contract action; and . . . a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages. *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

### B. MVP contracted with Optum for actuarial services that were performed in accordance with the ASOPs and in a non-negligent manner, and the parties did not contract for a limitation of damages provision.

The Court ruled at summary judgment that a contract existed between MVP and Optum for the provision of actuarial services related to the 2013 MA bids. It remains to determine the contents of that agreement. "Under New York law, the key to contract interpretation is 'the parties' reasonable expectations.'" *Glassalum Int'l Corp. v. Albany Ins. Co.*, No. 03 Civ. 9166 (DC), 2005 WL 1214333, at *6, 2005 U.S. Dist. LEXIS 9767, at *16 (S.D.N.Y. May 23, 2005) (citing cases). "To give effect to the parties' reasonable expectations, the court must 'determine the parties' purpose and intent.'" *Id.* (quoting *Sunrise Mall Assocs. v. Import Alley of Sunrise Mall, Inc.*, 621 N.Y.S.2d 662, 663 (2d Dep't 1995)).

#### 1. The parties did not agree to a limitation of damages provision.

"[N]ot all terms of a contract need be fixed with absolute certainty, and courts will not apply the doctrine of indefiniteness to 'defeat the reasonable expectations of the parties in entering into the contract.'" *Kramer v. Greene*, 142 A.D.3d 438, 439 (App. Div. 1st Dep't 2016) (citation omitted). Here, the Court concludes that the parties had a sufficient meeting of the minds on all material terms of the contract.[11] The parties agreed, *inter alia*, on the services to be performed by Optum, the time for performance, and the amount that MVP would pay for that performance.

In contrast to the parties' agreement on these material terms, the record shows that the parties did not mutually contemplate limitation of damages when discussing or performing the contract for actuarial services related to the 2013 MA bids. Optum argues that the unsigned 2012 SOS incorporated the 2003 MSLA, which contains a limitation of damages provision, indicates agreement. (Dkt. No. 102, p. 39). However, as the Court noted at summary judgment, the parties did not waive the 2003 MSLA's express requirement that they complete and execute an SOS for services to fall under the MSLA terms. *MVP*, 2016 WL 6638190, at *8–11. Moreover, the 2012 SOS was not in effect—it was unsigned and there is no evidence that it was ever advanced beyond the draft stage. *Id.* at *5–6.

In creating a contract detached from the 2003 MSLA, the parties were free to agree upon a limitation of damages or to omit such a provision. There is no communication suggesting that they did so agree. Given the parties' longstanding relationship, the Court examines whether relevant meaning is found in a course of dealing—a "sequence of previous conduct between the

---

[11] As the Court noted at summary judgment, "[t]he record is replete with documentation of the parties' relationship that clearly indicates a meeting of the minds, including the February 7, 2012 Li letter and its appendices . . . evidence of meetings . . . and various invoices." *MVP*, 2016 WL 6638190, at *12. The Court also noted that "[t]he parties performance in 2012 and in years prior is itself a clear indication of a contract." *Id.* Finally, the Court cited a Southern District case, in which a contract existed where the parties did not execute a master agreement but instead "conducted business pursuant to a system of purchase orders and invoices." *Id.* (quoting *Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC*, No. 07-CV-6665 (HB), 2009 WL 1803458, at *2, 24, 2009 U.S. Dist. LEXIS 54670, at *4, 78 (S.D.N.Y. June 23, 2009)).

parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Restatement Second of Contracts § 223. "The parties' conduct under similar, prior contracts with each other can be of great assistance to a court which must determine the parties' intended meaning when they formed the contract currently being interpreted." 5-24 Corbin on Contracts § 24.17. Here, the record contains no evidence of relevant conduct in the parties' relationship. As the Court noted at summary judgment, "from at least 2006 to 2012, MVP and Optum did not execute any [] product schedules pertaining to their annual Medicare bid work." *MVP*, 2016 WL 6638190, at *3. Nothing in this case shows that the parties previously contemplated limited liability outside the MSLA context, discussed such a provision, or disputed issues of liability. Though the 2011 Amendment to the 2003 MSLA reaffirmed the limitation of liability provision for damages *arising under the MSLA framework*, there is no evidence that the parties agreed to such a limitation for contracts *outside* that framework.[12]

The Court next considers custom and usage. Under New York law, "'custom and usage evidence must establish that the omitted term is 'fixed and invariable' in the industry in question.'" *Rapay v. Chernov*, No. 16-CV-4910 (DLC), 2017 WL 892372, at *4, 2017 U.S. Dist. LEXIS 31401, at *11 (S.D.N.Y. Mar. 6, 2017) (quoting *Hutner v. Greene*, 734 F.2d 896, 900 (2d Cir. 1984)). The Niehus Supplemental Expert Report notes that she has "seen contracts that contain [limitation of liability] clauses . . . [and] contracts that do not contain these clauses." (P-6, p. 15). Niehus' experience in the actuarial field provides weight to her assertion that actuarial agreements do not invariably include such language. Optum's expert testified that a limitation of liability clause is "[i]n keeping with prevalent practice in the actuarial consulting

---

[12] Again, as noted at summary judgment, the wording of the 2003 MSLA and its 2011 Amendment repeatedly limits applicability of MSLA provisions to work "pursuant to this Agreement." *MVP*, 2016 WL 6638190, at *8–9. These "self-referential provision[s do] not limit the parties' ability to contract under a separate agreement." *Id.* at *9.

community" and that "in [his] experience, these types of provisions are now standard in actuarial service contracts." (D-34, p. 18). That which is "prevalent" or "standard" is not necessarily "fixed and invariable." In any event, the Court credits Niehus' report and finds on this record that there is no relevant "fixed and invariable" custom in the industry, and that there is insufficient evidence of industry custom to support a finding that the parties' contract included an agreement to include a limitation of damages.

In sum, considering all of the testimony and the record evidence, the Court concludes that the parties did not mutually assent to a limitation of damages provision for the 2013 MA bids contract. Nothing in MVP's communications to Optum suggests an intent to be bound to such a provision outside of the context of the 2003 MSLA.

### 2. Optum contracted to provide actuarial services in accordance with the relevant ASOPs.

Under its agreement with MVP to provide actuarial services for the 2013 MA bids, Optum undertook a contractual obligation to abide by the ASOPs. Trial testimony establishes that compliance with these standards was within the reasonable expectations of both parties. Optum actuaries Greenwood and Li testified that they are required to follow the ASOPs when providing professional services to clients. (TT 33, pp. 144–47). The MA bids that Greenwood was expected to certify required an affirmation that Optum followed the applicable ASOPs. (J-36). Though Greenwood testified that MVP and Optum did not contract for compliance with the ASOPs, (*id.* at p. 155), the Court does not credit that testimony, in part because he also testified that it would be reasonable for MVP to expect Optum to comply with the ASOPs when performing its actuarial work and that such compliance was "part of the service that we provide" and "part of what MVP paid for." (*Id.* at 153–56). Additionally, Niehus testified that for an actuary to maintain their credentials, they must comply with the ASOPs. (*Id.* at p. 512). In short,

22

the parties both expected the relevant actuarial work to be performed in accordance with the ASOPs. In light of this testimony, the Court concludes that the contractual promise to perform actuarial services included an obligation to comply with those standards. *See New York State Workers' Compensation Bd. v. SGRisk, LLC*, 38 Misc. 3d 1229(A) (Sup. Ct. N.Y. Mar. 1, 2013) (finding that where parties contracted for actuarial services that comply with "accepted actuarial standards," failure to abide by those standards substantiated a breach of contract claim).

Optum argues that non-compliance with the ASOPs "cannot form the basis of MVP's breach of contract claim." (Dkt. No. 102, p. 27). In support of this proposition, Optum cites *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, No. 12 Civ. 6811 (CM) (JCF), 2014 WL 2199428, at *13, 2014 U.S. Dist. LEXIS 72655, at *39 (S.D.N.Y. May 23, 2014), which refers to an ASOP not at issue here regarding policy classes, and says that its "language offers only general guidance and does not settle" the classification issue in question. The *U.S. Bank Nat'l Ass'n* court, adjudicating a dismissal motion, found that "[g]iven the experts' differing opinions regarding the relevant actuarial standards, an issue of fact remains." *Id.* In contrast here, the Court is empowered to credit expert testimony as it sees fit and concludes that the relevant ASOPs contain standards for actuarial work that were within the parties' reasonable expectations.

### 3. Optum had an obligation to perform the contract without negligence.

New York law provides that "[n]egligent performance of a contract may give rise to a claim . . . for breach of contract." *PPC Broadband, Inc. v. Transformix Eng'g, Inc.*, No. 5:14-CV-0315 (MAD/TWD), 2015 WL 339564, at *15, 2015 U.S. Dist. LEXIS 8343, at *39 (N.D.N.Y. Jan. 26, 2015) (quoting *Dorking Genetics v. United States*, 76 F.3d 1261, 1269 (2d Cir. 1996)). New York courts recognize that contractual obligations necessitate performance with due care. 14 N.Y. Prac., New York Law of Torts § 6:13 ("One who assumes a contractual

duty remains subject to the common law duty to use due care."); *see also Deutsche Bank Sec. Inc. v. Rhodes*, 578 F. Supp. 2d 652, 671 (S.D.N.Y. 2008) ("Merely alleging that the breach of contract duty arose from a lack of due care will not transform a simple breach of contract into a tort."). Here, Greenwood testified that part of the agreement between MVP and Optum was that Optum "would provide reasonable care in the development of the bids and actual services." (TT, p. 155). In light of Optum's known specialization in providing actuarial services for MA Plan bids, the longstanding relationship between MVP and Optum, the substantial cost of the actuarial services, and all other testimony and evidence in the record, the Court concludes that the contract included an obligation that Optum provide actuarial services in a reasonable, non-negligent fashion.

### C. Optum breached its obligations under the contract with MVP.

Optum actuaries failed to perform their tasks in compliance with the ASOPs. As noted above, ASOP 23 requires the actuary to "review the data for reasonableness and consistency" or otherwise inform the client that no such review occurred. Optum's failure to review the data and manage it appropriately is demonstrated by confusion among Optum actuaries regarding MVP's cost sharing practices, Li's creation of a new DMT that misidentified those practices, and Optum's ultimate reliance on the incorrect information. After Li failed to import the correct cost sharing data into her version of the DMT, she then ignored the cost sharing information in Tate's updated PBPCats tab and 2012 DMT version that he sent her, keeping her new cost sharing assumptions instead. Subsequent internal review at Optum was insufficient to catch this significant error, despite Greenwood's certification of the accuracy of the bids and compliance with the ASOPs. Thus, the Court concludes that Optum did not comply with ASOP 23.

The Court also concludes that Optum violated ASOP 41 by not clearly communicating DMT changes to MVP in a manner designed for the intended audience, which the standard requires. As noted above, the Court has found that Li did not communicate the DMT changes to MVP; however, even assuming *arguendo* that Li gave some oral notice to MVP, Optum would still be in breach. Li testified that she should and normally would inform the client of such a significant change in writing. Moreover, she did not highlight or explain the changes in accordance with Optum's common practice with MVP actuarial work. Also, because Tate is not an actuary, ASOP 41 would require Li to tailor her communications to him with this in mind.[13]

Finally, Optum breached its contractual duties with its generally negligent performance. "New York courts frequently hold that '[a] person undertaking to perform work is charged with the common law duty to exercise reasonable care and skill in the performance of the work.'" *Banco Multiple Santa Cruz, S.A. v. Moreno*, 888 F. Supp. 2d 356, 368 n.14 (E.D.N.Y. 2012) (citing cases) (alteration original in *Banco*). This duty can give rise to a breach of contract action. *Id.* (citing cases). Here, for substantially the same reasons noted above, Optum breached its obligation to act with due care.

### D. Optum's breach caused MVP's injury.

Under New York law, a plaintiff in a breach of contract action "must prove that a defendant's breach *directly and proximately caused* his or her damages." *Nat'l Market Share,*

---

[13] Optum's expert witness Reese testified that Optum complied with these ASOPs because its communications with MVP were clear and communications about plan provisions were not "actuarial communication" within the meaning of the ASOPs. (TT, pp. 650–55). Conversely, MVP's expert Niehus testified that the communications were unclear, that the relevant communications were covered under the ASOPs, and that Optum did not properly maintain data quality. (*Id.*, at pp. 526–28, 537–39). The Court credits the Niehus testimony. First, for reasons noted above, the Court agrees that Optum's communications with MVP were not clear within the meaning of ASOP 41. Second, the Court concurs with Niehus that the relevant communications were actuarial communications within the meaning of ASOP 41, which defines such communication as "[a] written, electronic, or oral communication issued by an actuary with respect to actuarial services." (P-1, p. 8). Finally, as Niehus testified, Optum did not maintain data quality in conformity with ASOP 23 because of Li's mismanagement of the DMT and the information that Tate sent her. (TT, pp. 537–38).

*Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (citing cases) (emphasis in original).

Damages resulting from other intervening causes are not recoverable. *Id.* at 526.

As noted above, the Court accepts the Niehus analysis of lost revenue as a result of Optum's negligent application of incorrect cost sharing assumptions. Implicit in that finding of fact is the conclusion that Optum's breach is the cause-in-fact of MVP's injury. It remains to determine whether the breach proximately caused that injury. Proximate cause "refers to a 'legal cause' to which the Court has assigned liability"—an act that directly causes a given result and is not so far removed in the causal chain that liability is inappropriate. *Burlington Ins. Co. v. NYC Tr. Auth.*, 2017 WL 2427300, 2017 N.Y. LEXIS 1404, at *9 (N.Y. June 6, 2017).[14]

The Court concludes that Optum's breach was the proximate cause of MVP's lost revenue. Because Optum failed to abide by the ASOPs and otherwise perform its actuarial work with reasonable care and skill, it (1) made material changes to cost sharing information without communicating any such changes to MVP and (2) relied upon those incorrect cost sharing assumptions to establish pricing parameters. As a result, MVP underpriced its MA plans and suffered lost revenue. As the Niehus analysis shows, the lost revenue at issue is measured in isolation of all other variables. Having removed other market factors, Niehus determined the losses that stemmed solely from Optum's negligent application of cost sharing assumptions.

Optum claims, however, that its actions did not proximately cause the injury; rather, Optum suggests that MVP's conduct is the proximate cause. (Dkt. No. 102, p. 38). Optum argues:

> Here, MVP's alleged damages were proximately caused by MVP's repeated failures to comply with OptumInsight's direct requests to review and provide comments on the [DMT], which set out the cost sharing information. Mr. Tate testified at trial that he did not tell anyone at MVP or OptumInsight that he did not

---

[14] Westlaw pagination unavailable.

review the new 2013 data mapping tab. . . .  It is undisputed that MVP did not supervise Mr. Tate's review . . . of the [DMT].

MVP's repeated failures to comply with OptumInsight's direct requests to review the [DMT] was the proximate cause of MVP's asserted damages.

(*Id.* at pp. 38–39).  As noted above, Tate admittedly failed to review the DMT; however, he alerted Li to his concerns about the cost sharing information in his email of April 27, 2012, and ultimately replied to Li's request for his comments with the correct cost sharing data in a PBPCats tab and the 2012 version of the DMT, which he indicated should form the basis for the 2013 bids.  Thereafter, Li failed to correct her version of the DMT and used that tab without informing Tate.  Thus, the Court concludes that in light of the overall interactions between MVP and Optum, Tate's purported failure was not the proximate cause of MVP's damages.

### E.  MVP is entitled to recover the contract price for Optum's services.

#### 1.  Lost Income

"Under New York law, damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract."  *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003).  MVP is therefore entitled to expectation damages, which may include "the amount necessary to put plaintiff in as good a position as if defendant had fulfilled the contract, plus consequential damages for other losses caused by the breach."  *R.M. Railcars LLC v. Marcellus Energy Servs., LLC*, No. 1:14-CV-1167 (BKS/RFT), 2015 WL 4508451, at *2, 2015 U.S. Dist. LEXIS 96491, at *4 (N.D.N.Y. 2015); *see also* Dobbs Law of Remedies § 12.2(3) ("Either general or special damages might be used as measures of expectancy.  In fact, both measures may be used in the same case to capture different elements of compensation.").  However, the proof required to recover consequential damages is more onerous than that required to recover general damages— for the former, Plaintiff must show, *inter alia*, that such damages "were fairly within the

contemplation of the parties to the contract at the time it was made." *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261 (1986).

Under New York law, "[g]eneral damages 'are the natural and probable consequence of the breach' of a contract." *Biotronik v. Conor Medsystems*, 22 N.Y.3d 799, 805 (2014) (citing cases). General damages are "market-measured damages" based on the "value of the plaintiff's entitlement;" "courts look at the plaintiff's assets, not at income lost or expenses incurred." Dobbs Law of Remedies § 3.3(3). These damages "measure[] the losses in the very thing to which the plaintiff is entitled," whereas consequential damages "measure[] something else; not the very thing the plaintiff was entitled to but income it can produce or losses it can avoid." *Id.* at § 3.3(4). "[C]onsequential . . . damages do not 'directly flow from the breach.'" *Biotronik*, 22 N.Y.3d at 805 (quoting *American List Corp. v. U.S. News & World Report*, 75 N.Y.2d 38, 43 (N.Y. 1989)).

In the Second Circuit, courts applying New York law typically find that lost income from third-party arrangements are consequential damages on grounds that they are "'one step removed from the naked performance promised by the defendant.'" *PNC Bank, N.A. v. Wolters Kluwer Fin. Servs.*, 73 F. Supp. 3d 358, 374 (S.D.N.Y. 2014) (quoting *Schonfeld v. Hilliard*, 218 F.3d 164, 177 (2d Cir. 2000)); *see also Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 109 (2d Cir. 2007) ("Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements."); *First Niagara Bank N.A. v. Mortgage Builder Software, Inc.*, No. 13-CV-592S, 2016 WL 2962817, at *8, 2016 U.S. Dist. LEXIS 67705, at *24–25 (W.D.N.Y. May 23, 2016) ("Although there is no bright-line rule stating that fees flowing from a third party cannot constitute general or compensatory damages, such cases are rare.").

Here, the lost income MVP suffered as a result of its mispriced health plans is closely tied to Optum's breach, because MVP relied on Optum's complex actuarial calculations and projections to set plan premiums. Nevertheless, MVP's lost income was a step removed from Optum's promised performance. The asset that Optum contracted to provide MVP was accurate actuarial calculations and analysis, submission to CMS, and certification of the bids' accuracy— not final pricing determinations or insurance for the plans' financial well-being. Thus, this is not one of the rare exceptions to the trend in this circuit; rather, this is a "typical case [where] the ability of the non-breaching party to operate his business, and thereby generate profits on collateral transactions, is contingent on the performance of the primary contract" and the breach hinders the non-breaching party's business. *Tractebel Energy Mktg.*, 487 F.3d at 89; *see also Biotronik*, 22 N.Y.3d at 806 ("Lost profits may be either general or consequential damages, depending on whether the non-breaching party bargained for such profits and they are 'the direct and immediate fruits of the contract.'"). That the potential damages—surmounting $12 million—far surpass the contract price also weighs in favor of a finding that such a disproportionate risk was not assumed. *See* Restatement 2d of Contracts § 351(3) cmt. f (noting that "extreme disproportion between the loss and the price charged by the party whose liability for that loss is in question" suggests that "the parties assumed that one of them would not bear the risk of a particular loss or that . . . it would be unjust to put the risk on that party"); *see also Int'l Ore & Fertilizer Corp. v. SGS Control Servs.*, 743 F. Supp. 250, 257 (2d Cir. 1990) (citing cmt. f and noting that ""[t]he mere fact that one party to an agreement has failed to satisfy a contractual duty of care does not necessarily mean that it will be held fully liable for all resulting damages, even if foreseeable"). For these reasons, the Court finds that MVP's lost income on third-party health plan contracts constitutes consequential damages.

Having determined that these damages are consequential, the Court next considers whether Plaintiff is entitled to them. In New York,

> Loss of future profits as damages for breach of contract have been permitted . . . under long-established and precise rules of law. First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty. . . . In addition, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made.

*Kenford Co.*, 67 N.Y.2d at 262. The *Kenford* court did not mean that the parties must have contemplated the *injury* at the time of contracting, but rather the "liability for loss of profits over the length of the contract." *Id.*; *see also* Dobbs Law of Remedies § 12.4(6) ("[I]f 'foreseeability' [of damages] is to be the test at all, it must not be understood as a simple factual term but as a term of art, a kind of shorthand for the more complex idea that damages should be limited as the parties intended.").

Here, there is no evidence that the parties contemplated Optum's liability for MVP's health plan losses. As MVP argues, it may be that "the losses incurred by MVP as a result of Optum's breach were . . . certain;" (Dkt. No. 101, p. 94) however, it is the parties' contemplation of liability—not just injury—that is at issue. Optum did not agree to act as an insurer for MVP's health plans or to otherwise accept liability for losses on third-party contracts. As a result, MVP is not entitled to recover lost income under the parties' contract.[15, 16]

---

[15] In its proposed findings of fact and conclusions of law, MVP cites *Toussaint v. James*, No. 01 Civ. 10048 (SHS), 2003 WL 21738974, at *6–7, 2003 U.S. Dist. LEXIS 12940, at *21–22 (S.D.N.Y. 2003), for the proposition that "MVP is entitled to those damages which naturally and probably flow from Optum's breach . . . includ[ing] all losses incurred by MVP as a result of Optum's actuarial errors." (Dkt. No. 101, p. 92). *Toussaint*, however, does not support MVP's claim for lost revenue. The issue in *Toussaint* was whether an actuary's allegedly unreasonable assumptions had *proximately caused* damage to an ERISA plan. Proximate causation was disputed, and the district court denied the actuary's motion for partial summary judgment as to damages. The distinction between general and consequential damages was not at issue in Toussaint, and not addressed. One of the Second Circuit cases cited in *Toussaint* refered to a claim against an actuary for damages for a shortfall in an ERISA fund, as a claim for consequential damages. *Gerosa v. Savasta & Co., Inc.*, 329 F.3d 317, 321 (2d Cir. 2003).

[16] The Court has considered Plaintiff's argument that under *Latham Land I, LLC v. TGI Friday's Inc.*, 96 A.D.3d 1327 (3d Dep't 2012) and *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186 (2d Cir. 2003), the Court should award all of MVP's losses as damages in order to "return MVP back to the position it would have been in but for

## 2. Contract Price

Unlike the lost income injury, the contract price for Optum's services constitutes general damages. General contract damages are "compensation calculated by the value of the very thing to which the plaintiff was entitled." Dobbs Law of Remedies § 3.3(1). Here, as noted above, MVP contracted for reasonable and non-negligent actuarial work that abided by the ASOPs. In consideration for this service, MVP tendered $332,981.44. The actuarial work that MVP received was negligent and violated the ASOPs, and it caused MVP to lose millions of dollars of income. Thus, the service that Optum provided MVP for the 2013 MA bids was worthless and MVP is entitled to recover the value of the asset for which it contracted—that is, the value of Optum's services, or $332,981.44.

## F. Interest

Under New York law, "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract." NY C.P.L.R. § 5001(a); *see also J.D'Addario & Co., Inc. v. Embassy Indus., Inc.*, 20 N.Y.3d 113, 117 (2012) ("The plain language of CPLR 5001(a) mandates the award of interest to verdict in breach of contract actions."). "Interest shall be computed from the earliest ascertainable date the cause of action existed." NY C.P.L.R. § 5001(b). This interest "shall be at the rate of nine per centum per annum, except where otherwise provided by statute." NY C.P.L.R. § 5004.

Here, the earliest ascertainable date that MVP's claims against Optum existed is June 8, 2012—when Greenwood certified and submitted the 2013 MA bids to CMS. Thus, the interest calculation shall be from that date until judgment is fully satisfied.

---

Optum's breach." (Dkt. No. 101, p. 94). Plaintiff cites those cases in defense of the propositions that it is entitled to damages that are the direct and immediate fruits of the contract and that it proved damages with the requisite certainty. However, for reasons noted above, the lost revenue in this case is not "direct" and "immediate" to the parties' contract and the level of certainty with which Plaintiff has shown damages is irrelevant because Plaintiff has failed to show that the parties contemplated liability for lost revenue at the time of contracting.

IV.     **CONCLUSION**

For these reasons, it is

**ORDERED** that Plaintiff MVP is awarded a money judgment in the sum of $332,981.44

with interest at 9% per annum from June 8, 2012 to the date that the judgment is fully satisfied.

**IT IS SO ORDERED.**

August 24, 2017
Syracuse, New York

Brenda K. Sannes
U.S. District Judge